IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRANDON MORTON,

               Petitioner,

vs.

KEN CLARK, Warden, California State
Prison-Corcoran,[1]

               Respondent.

No. 2:16-cv-01762-JKS

MEMORANDUM DECISION

Brandon T. Morton, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Morton is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at California State

Prison-Corcoran. Respondent has answered, and Morton has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On May 21, 2009, Morton, along with co-defendants Anthony Arturo Medina and David

Valentino Whitehead, was charged in a multi-count information stemming from two separate

incidents. In the first, Medina fired a gun at a black Lexus, hitting its two occupants, while

driving with Morton and Whitehead in the backseat. In the second, Morton, believing he had

been "shorted" several grams of methamphetamine in a drug sale, shot and killed the boyfriend

of the woman who had made the sale. On direct appeal of his conviction, the California Court of

Appeal laid out the following facts underlying the charges against Morton, the evidence

presented at trial, and the resulting convictions and sentences:

---

    [1]     Ken Clark is substituted for Stu Sherman as Warden, California State Prison-
Corcoran. FED. R. CIV. P. 25(d).

*May 2, 2008, Shooting*

In May 2008, 15–year–old Brittany S. was living with 19–year–old defendant Medina. In the early morning of May 2, Medina was driving S.'s Impala; Sarantis was in the passenger seat and defendants Morton and Whitehead were in the rear seat, along with S.'s cousin, 15–year–old Waylon R. They had just left a liquor store and were driving down Florin Road. A black Lexus was driving erratically, close to the Impala, and appeared out of control. The car would speed up to right behind them and then brake. The occupants of the Impala were concerned and frightened.

Medina pulled into a left turn lane and stopped, letting the Lexus pass by. Then, instead of turning, he continued to drive straight, running a red light and following the Lexus. Medina drove up beside the Lexus at a stop light. S. lay down in her seat and Medina reached across her and fired several shots into the Lexus.

Angelo Granados was driving the black Lexus and Miguel Ramos was his passenger. Ramos was shot in the knee, requiring stitches. Granados was shot in the upper thigh. Both were taken to the hospital and were in great pain when first interviewed by the police.

Detective Thomas Higgins interviewed S. about the shooting. She told him that Morton handed Medina the gun used for the shooting, but later said she did not actually see Morton hand over the gun. She told the police Morton had a gun out and had said, "if they pull up beside us, I'll get them."

Detective Higgins also interviewed Armando Mora, who knew Medina, Morton and Whitehead. Mora was on parole in April 2008. He told the police he heard Medina was trying to buy a gun at that time and told him, "'Hell, no, you can't do that here.'" Medina responded, "'fool, you know wherever I am I'm strapped'" and pulled out a gun. Mora also told the police that after the shooting, Medina, Whitehead, and "the little white dude" showed up and Medina said they "got into it with some guy on Florin" and Medina "busted on him," meaning he shot at him.

After Medina was arrested he called S. and asked her where the Impala was, telling her the police wanted to know. She told him where it was parked. Detectives subsequently asked her to bring the Impala to them, but it had been stolen the night after Medina's call.

S. claimed she saw Ramos after the shooting and he threatened to kill her.

*May 5, 2008, Killing*

Morton sold drugs for a living. He gave his girlfriend Holly Sarmento $700 to buy a half ounce of methamphetamine for him to resell. She was to get the drugs through her best friend, Jennifer Cauble. On the afternoon of May 4, Sarmento, Cauble, and a man named Tim went together to purchase the methamphetamine. Sarmento claimed Cauble told her that Tim had put some money in for the purchase, so he received a chunk of the methamphetamine, and she and Cauble smoked $20 worth of the drug in Oak Park. Cauble did not recall either of these events.

Sarmento took the methamphetamine from Cauble to Morton's. That night, he called her and told her the drugs were short. He wanted her to meet with Cauble to settle

the matter.  Cauble told Sarmento that her boyfriend Jason Fletcher would take her to meet with Morton.

After several discussions by telephone, Cauble and Morton decided to meet near a post office.  Morton drove with Sarmento to the meeting in her parents' car.  Sarmento recalled seeing Whitehead nearby when they left.  Fletcher drove Cauble; his "homey" Marty Rainville came too as "muscle."  It was around midnight when they met.

Morton got out of the car and spoke with Fletcher; he then got in the backseat of Fletcher's car.  Morton had a scale and he gave the methamphetamine to Cauble to weigh. She told him it was short.  Cauble noted the drugs appeared to be a different consistency from those she had bought.  Morton called Sarmento over and asked if the drugs were the same; she said yes.  Cauble told Morton she could "fix it," that is, get his money back.

Morton and Rainville were arguing.  Rainville had his hands in his sweatshirt and Morton thought he had a gun.  Rainville denied he had anything.  Then a car pulled up with Medina and Whitehead inside.  Morton got out of Fletcher's car and pulled out a gun.  Whitehead pulled a gun on Cauble.  Cauble believed all three men had guns, but Sarmento was not sure that Medina did.

Morton ordered everyone out of Fletcher's car.  Morton, Medina, and Whitehead walked Fletcher and Rainville across the street at gunpoint.  Rainville took off his jacket and hung it on the tailgate of a truck.  There was a knife inside.
According to Cauble, when Morton ordered them out of the car, he told Fletcher to leave the car keys.  Morton returned to the car, but the steering column had been tampered with and Morton could not start the car.  He asked Cauble how to start it, but she would not tell him.  Morton was angry and ran to Fletcher.  He yelled at Sarmento to get in her parents' car.  Whitehead got in to drive and the two drove away.  Medina had returned to his car.  Morton shot Fletcher twice.  Whitehead and Sarmento heard the two shots and Whitehead turned the car around and returned.  They encountered Medina and Morton leaving the scene together and turned around again to follow them away.  Later, Morton got into the car with Sarmento and Whitehead joined Medina in the other car.

Cauble and Rainville knocked on doors, trying unsuccessfully to get help for Fletcher.  Rainville broke a window in one house.  Finally, they took Fletcher to the hospital, where he died of a gunshot wounds to his left shoulder and chest.

*Morton's Letter*

In 2009, a deputy sheriff searched Morton's jail cell and found a letter.  The letter stated: "This is what I need the witness to say so that I can get unperfect [sic] self-defense which only holds ten years."  The letter stated the witness should be female, preferably older.  It outlined what the witness should say—that she saw a white guy on a porch shoot—and how she should answer certain questions.  The letter included a map of the area of the shooting.

*Medina's Defense*

Waylon R. testified that when he saw the Lexus driving erratically on Florin Road, he got down for his safety.  He was concerned due to the area and "knowing

Sacramento." Before the shooting, the driver's window of the Lexus came down and R. saw a hand reach down low. Someone in that car said, "[i]s that them"?

Medina testified he shot into the Lexus for "[f]ear of my life." When he saw the Lexus coming up fast and swerving, he grabbed his gun and put it in his lap. He felt they "were going to do something." When he pulled up next to the car at the stop light, everyone in his car was down and he heard someone in the other car ask, "'[I]s that him right there?'" He saw the driver put his hands under the seat and come up fast. Medina reached over and fired.

Medina explained he had problems with a gang that claimed the Franklin Boulevard area. He had been a member of the gang, but had left it and now they were trying to kill him. Gang members had called him and threatened him and they had shot at his brother.

On May 4, Medina had weighed the methamphetamine Sarmento brought back from Cauble and told Morton it was five grams short. When Morton left to get his money back, he asked Medina if he wanted to come. Medina drove separately with Whitehead, who had asked if he could go. Medina claimed he did not have a gun. His intention was to make sure Morton got his money back.

When Medina and Whitehead arrived at the meeting, Morton told them to "watch the white boy, I think he's got a gun." Morton told Rainville (who was White) to take off his jacket. When Whitehead put his gun down and went to the car, Medina got in his own car and started to leave. Morton told him to wait. Medina was turning around when he heard gunshots. He slammed on the brakes because he thought he might get shot; the shots were "real close." Morton jumped in the car with Medina and they drove off. When they stopped to switch cars, Medina was angry with Morton and told him to "[g]et the fuck out of the car."

It was stipulated that when Fletcher's car was impounded, there were 10 grams of methamphetamine and a scale inside.

*Morton's Defense*

Cauble had smoked methamphetamine with Fletcher the day of the shooting; they were smoking all the time. Fletcher's blood analysis at his autopsy showed a methamphetamine level of 2.5 milligrams per liter, an extremely high level. Experts testified a therapeutic level is 0.01–0.05 milligrams per liter; anything above 0.1 or 0.2 milligrams per liter is considered an abuse level. The recreational use of methamphetamine keeps one awake and very energetic. A user may misperceive his environment and become aggressive, violent, unpredictable, and have delusions and anxiety disorder.

A young girl who lived near the shooting testified she heard glass breaking and people fighting the night of the murder. She heard punching and people saying, "[H]ow do you like that?" She heard glass break and then banging.

Morton testified that on May 2, he was fearful of the Lexus's aggressive driving. He heard someone say, "where's my gun?" or something similar, but denied he handed Medina a gun. He heard someone in the other car say, "is that that nigger right there?"

and thought they meant him as he was the only African–American. After the shooting, Medina handed him a gun and Morton put it in the trunk.

When Morton was in the backseat of Fletcher's car on May 5, the first thing he did was hand Fletcher the drugs to weigh. Rainville was fidgeting at his waist and Morton asked if he had a gun. Morton saw a handle of what he thought was a knife. When Cauble claimed it was "different dope," Morton believed she was trying to "pump up" Fletcher and Rainville into believing Morton had switched the dope and was scamming them. Fletcher was high, talking fast and switching subjects. He said he did not "do business with niggers" and "I stay with mine." Cauble had testified Fletcher did not like Black people.

Morton claimed that when he got out of the car and pulled a gun, he was thinking only to get his drugs back. He told Sarmento to "get out of there." Morton told Cauble to get his drugs and then he put his gun in his sweatshirt. Fletcher grabbed Morton's sweatshirt and they began "tussling." Morton pushed Fletcher off and might have kicked him. Fletcher fell and when he started to get up, Morton saw him reaching for something and shot him. Morton thought Fletcher was grabbing for a gun. After the shooting, he jumped into Medina's car. He threw the gun away the next day.

Morton claimed he wrote the letter about the witness he needed because he was "terrified" after he received Cauble's statement.

*Convictions and Sentencing*

As to the events of May 2, the jury found Medina guilty of two counts of attempted first degree murder (Pen. Code, §§ 664/187, subd. (a))1 with enhancements for discharging a firearm and causing great bodily injury (§ 12022.53, subd. (d)), and one count of shooting at an occupied vehicle (§ 246) with the same two firearm enhancements. The jury also found Medina guilty of unlawful possession of a firearm. (Former § 12021, subd. (a).) It had been stipulated that Medina had a felony conviction. As to the events of May 5, the jury found Medina guilty of first degree murder (§ 187, subd. (a)) and found the attempted robbery special circumstance true (§ 190.2, subd. (a)(17)(A)), but found not true the attempted carjacking special circumstance (§ 190.2, subd. (a)(17)(L)) and the personal use of firearm enhancement (§ 12022.53, subd. (b)). It found Medina guilty of attempted robbery (§§ 664/211), but not guilty of either attempted carjacking (§§ 664/215), or unlawful possession of a firearm (former § 12021, subd. (a)).

The court sentenced Medina to LWOP on the murder count, and to life plus 25 years to life on each of the two attempted murder counts. Sentence on the other counts was stayed pursuant to section 654. The aggregate sentence was LWOP plus 64 years to life.

The jury acquitted Morton of all counts arising from May 2, except unlawful possession of a firearm. It had been stipulated that Morton had a felony conviction. The jury found Morton guilty of first degree murder with an attempted robbery special circumstance and a personal discharge of a firearm enhancement, attempted robbery, and unlawful possession of a firearm arising from the events of May 5. It acquitted him of

the attempted carjacking and the related special circumstance. The trial court found Morton had a strike prior.

      The court sentenced Morton to LWOP plus 25 years to life on the murder charge, stayed the sentence pursuant to section 654 on the other counts from May 5, and sentenced him to six years (three years doubled) for the May 2 unlawful possession of a firearm. His aggregate prison sentence was LWOP plus 31 years to life.

      The jury found Whitehead guilty of first degree murder with an attempted robbery special circumstance and a personal use of a firearm enhancement (§ 12022.53, subd. (b)), and attempted robbery. It acquitted him of the attempted carjacking special circumstance and charge. The court sentenced him to LWOP on the murder count plus 10 years for the enhancement. It stayed the sentence on the attempted robbery.

*People v. Medina*, 200 Cal. Rptr. 3d 133, 135-39 (Cal. Ct. App. 2016) (footnotes omitted).

      Through counsel, Morton appealed his judgment, arguing that: 1) there was insufficient evidence that Morton committed attempted robbery to sustain the attempted robbery and felony murder convictions; 2) the court violated his rights to present a defense and to a fair trial by excluding evidence that Fletcher asked Cauble to find a knife prior to their meeting with Morton; 3) the abstract of judgment should be amended to reflect that the trial court stayed Morton's sentence on Count 4; and 4) the abstract of judgment should be corrected to show Morton's actual custody credits. On February 11, 2015, a unanimous Court of Appeal issued a reasoned, unpublished opinion modifying the abstracts of judgment to award all three defendants custody credit and to impose and properly stay the sentences on Counts 2, 4, and 8. *People v. Medina*, Case No. C069965, 2015 WL 581385, at *20 (Cal. Ct. App. Feb. 11, 2015). The appellate court affirmed the judgments in all other respects. *Id.* After the California Supreme Court issued *People v. Banks*, 351 P.3d 330 (Cal. 2015), which articulated the standards to apply in determining whether an accomplice who lacks the intent to kill may qualify as a major participant for purposes of the felony-murder special circumstance, that court granted review and remanded the case to the Court of Appeal for consideration in light of *Banks*. *Medina*, 200 Cal.

Rptr. 3d at 134-35.  On April 14, 2016, he Court of Appeal issued a modified opinion rejecting Medina's and Whitehead's claims based on *Banks*.  *Id.* at 142-44.  The California Supreme Court denied review on June 29, 2016.

While his direct appeal was pending, Morton filed a *pro se* petition for writ of habeas in the Sacramento County Superior Court.  Docket No. 8.  In that petition, Morton alleged that: 1) trial counsel was ineffective for failing to object to the prosecution's amendment of the information; 2) appellate counsel was ineffective for failing to raise trial counsel's error on direct appeal; and 3) trial counsel was ineffective for failing to properly object to the admission of Morton's letter.  *Id.*  The superior court denied the petition, finding that it had no jurisdiction over the first two claims and rejecting the third claim as meritless.  Docket No. 24-9.

After the Court of Appeal issued its first opinion on direct appeal, Morton filed a second *pro se* habeas petition re-raising Claims 1 and 2 in superior court.  Docket No. 24-10.  The superior court denied the claims on both procedural grounds and on the merits on November 15, 2016.  Docket No. 24-11.

Morton then raised the claims he had unsuccessfully raised to the Superior Court in a *pro se* habeas petition to the Court of Appeal.  Docket No. 24-12.  The Court of Appeal denied the petition without prejudice to filing the petition with the Superior Court after the direct appeal was final.  Docket No. 24-13.  After the direct appeal concluded, he re-filed his habeas petition in the Court of Appeal.  Docket No. 24-14.  That petition was denied without comment.  Docket No. 24-15.  He raised the same claims in a *pro se* petition for writ of habeas relief in the California Supreme Court, Docket No. 24-16, which was likewise summarily denied on June 28, 2017, Docket No. 24-17.

While his state court petitions were pending, Morton timely filed a *pro se* Petition for a

Writ of Habeas Corpus to this Court on July 17, 2016.  Docket No. 1 ("Petition"); *see* 28 U.S.C.

§ 2244(d)(1)(A).  His state court petitions have now been denied, and his claims fully exhausted.

This case is now before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Morton argues that: 1) trial counsel was

ineffective for failing to object to the prosecution's post-preliminary hearing amendment of the

information; 2) trial counsel was ineffective for failing to move to suppress a letter obtained from

Morton's jail cell; 3) there was insufficient evidence of attempted robbery; 4) the trial court erred

in failing to instruct the jury on a claim-of-right; 5) the trial court erred in excluding evidence

that Fletcher may have suffered injuries from engaging in a prior fight; 6) the trial court erred in

excluding evidence that Fletcher asked Cauble for a knife before meeting with the defendants;

and 7) the existence of cumulative error warranted reversal of his convictions.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.      Ineffective Assistance of Counsel (Grounds 1, 2, 7)

Morton first contends that trial and appellate counsel rendered ineffective assistance.  To

demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must

show both that appellate counsel's performance was deficient and that the deficient performance

prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the

outcome might have been different as a result of a legal error, the defendant has established

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.

United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas

petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice

standard is applied and federal courts do not engage in a separate analysis applying the *Brecht*

harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin

v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective

assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that

determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Morton must show that either his trial or appellate counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

1.    *Failure to object to amendment of information*

Morton first argues that trial counsel was ineffective for failing to object to the prosecution's amendment of the information to add a robbery-murder special circumstance because the preliminary hearing transcript did not reflect Morton being involved in a robbery, and that appellate counsel was ineffective for failing to raise that issue on appeal. Morton raised these claims in seeking habeas relief in the state courts. In the last reasoned decision, the superior court denied the claim on procedural grounds and on the merits.

As an initial matter, it appears that this claim is procedurally barred from federal habeas review. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This

Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims." *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992). "The state-law claim may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011). Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case "clearly and expressly" states that its judgment rests on a state procedural bar. *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (quoting *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)). "In order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default." *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

The Superior Court's citation to *In re Robbins*, 959 P.2d 311 (Cal. 1998), and *In re Clark*, 855 P.2d 729 (Cal. 1993), reflects that Morton's ineffective assistance claims were denied because as untimely, *Walker*, 131 S. Ct. at 1126. The Ninth Circuit has held that California's "substantial delay" timeliness standard satisfies the "independent and adequate" requirement. *See Bennett*, 322 F.3d at 582-83; *see also Walker*, 131 S. Ct. at 1131 (finding that California's timeliness standard is adequate). The Ninth Circuit has further stated:

> If a petitioner has procedurally defaulted on a claim, a federal court may nonetheless consider the claim if he shows: (1) good cause for his failure to exhaust the claim; and (2) prejudice from the purported constitutional violation; or (3) demonstrates that not hearing the claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640; *Sawyer v. Whitley*, 505 U.S. 333, 339-40, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). An objective factor outside of a petitioner's control (*e.g.*, ineffective assistance of counsel or a basis for the claim that was previously unavailable) could constitute cause. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991). The petitioner can meet the prejudice

prong if he demonstrates "that the errors . . . worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir.1989) (citing *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)). A petitioner can demonstrate a fundamental miscarriage of justice by "establish[ing] that under the probative evidence he has a colorable claim of factual innocence." *Sawyer*, 505 U.S. at 339, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (quotation marks omitted).

*Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

Morton provides no justification in his Petition as to why the claim was untimely brought before the state courts and thus does not explain why it should not be procedurally barred here. In any event, the superior court additionally found that the claims were without merit. That court reasoned:

> [T]he preliminary hearing transcript clearly contains sufficient evidence to show the attempted-robbery-murder special circumstance that was found true. Jennifer Cauble's testimony established that petitioner believed he had been stiffed in a drug deal and that the occupants of the victim's car were responsible, that petitioner and his two codefendants all pointed their guns at the occupants of the victim's car, and that petitioner ordered the occupants out of the car and to leave the keys, all of which gave some rational ground to support attempted robbery. The Third District . . . addressed the issue of whether there was insufficient evidence of attempted robbery presented at trial, and concluded that Cauble's trial testimony, which appears to have been similar to that given at the preliminary hearing, provided substantial evidence of the attempted robbery of the victim's car. The Third District concluded that the fact that the jury acquitted petitioner of attempted carjacking does not affect the question of whether there nevertheless was sufficient evidence of attempted robbery, as the law generally accepts inconsistent verdicts as occasionally inevitable. As the jury acquittal of attempted carjacking does not affect whether or not there was some rational ground to believe that petitioner had committed attempted robbery during the commission of the murder, which would have been the standard of review by this court had petitioner raised the matter in a Penal Code § 995 motion to dismiss the attempted-robbery-murder special circumstance before trial, petitioner does not prevail on this claim.

Docket No. 24-11 at 2-3 (citation omitted).

The Superior Court's determination is both reasonable and fully supported by the record. For the reasons explained by the Superior Court, Morton would not have been successful had he

moved to dismiss the attempted-robbery-murder special circumstance before trial, and he thus cannot show that trial or appellate counsel were deficient in so failing to move or that he was prejudiced by their actions. Accordingly, Morton is not entitled to relief on these claims.

2.      *Failure to move to suppress letter*

Morton additionally argues that trial counsel rendered ineffective assistance in failing to object to the prosecution's use of a letter taken from his jail cell. Prior to trial, defense counsel requested that the court "do a 352 analysis"[2] to balance the probative nature of the letter against any undue prejudice. Over defense objection, the trial court admitted the letter. At trial, a law enforcement officer read the unaddressed letter to the jury, in which Morton requested that the recipient find a witness who would be willing to state that she saw the events just prior to the shooting and saw a white person on a porch had a gun, and described the circumstances around its seizure. According to Morton, the letter was obtained not during a general cell search, as the officer testified, but as part of the prosecution's building a case against Morton.

Morton argues, as he did on state habeas review, that counsel was ineffective for not moving to suppress the letter on illegal search and seizure grounds. The superior court denied the claim in a reasoned opinion after concluding that Morton failed to establish that the seizure was committed in violation of the Fourth Amendment. Morton's Petition, like his state habeas petition, is based purely on speculation that the jail officials had improper motives for seizing his

---

[2]      California Evidence Code § 352 grants courts discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Federal Rule of Evidence 403, the federal counterpart to § 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

property.  But such argument is far too speculative to warrant relief here.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (granting habeas relief "on the basis of little more than speculation with slight support" is improper).  The record supports that trial counsel challenged the admission of the letter on the only grounds available to him, California Evidence Code § 352.  Morton fails to show that trial counsel should have additionally moved to suppress the letter on Fourth Amendment grounds, and he is not entitled to relief on this claim.

B.      Insufficiency of the Evidence (Ground 3)

In Ground 3, Morton alleges that there was insufficient evidence of attempted robbery. All defendants raised this claim on direct appeal, contending that Morton was attempting only to retrieve his *own* drugs from Cauble and Fletcher, so there was no attempt to take the property of another.  Morton specifically argued that, because the jury acquit him of the carjacking charge, it could not permissibly find true the allegation that he attempted to rob the victim of a car.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not

affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should

be drawn from evidence admitted at trial." *Cavazos*, 132 S. Ct. at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The Court of Appeal rejected Morton's insufficiency of the evidence claim as follows:

Cauble's testimony provided substantial evidence of attempted robbery of Fletcher's car. When Medina and Whitehead arrived as backup, Morton got out of Fletcher's car and ordered the others out at gunpoint. He told Fletcher to leave the keys. While Medina and Whitehead detained Fletcher and Rainville at gunpoint, Morton attempted unsuccessfully to start the car and asked Cauble how to start it. The only reasonable inference from this evidence is that he was trying to steal the car.

Defendants note the jury acquitted them of attempted carjacking, suggesting the evidence of the attempt to take the car cannot be considered. But we need not ignore the evidence supporting the charge of attempted carjacking to determine if there is sufficient evidence of attempted robbery. "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*People v. Palmer* (2001) 24 Cal.4th 856, 860.) "[I]f an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. [Citations.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.) "The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . . .' [Citation.]" (Ibid.)

"[T]he criminal justice system must accept inconsistent verdicts as to a single defendant. [Citation.] . . . ' "[A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary."' [Citation.]" (*People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 13.)

*Medina*, 2015 WL 581385, at *7-8 (footnote omitted).

The appellate court's holding fully comports with federal law, under which "it is well-established that inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict." *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (citation, internal quotation marks and bracketing omitted). Thus, while the jury's true finding on the attempted robbery allegation may seem somewhat logically inconsistent with the jury's acquittal on the carjacking charge, that alleged inconsistency is not grounds for habeas review because substantial evidence supports the jury's verdict.

C.     Instructional Error (Ground 4)

In a related argument, Morton also contends that trial court erred in instructing on claim-of-right. According to Morton, because the evidence showed that he was attempting to take his own property from another, the instruction was inapplicable. He contends, as he did on direct appeal, that there was no scenario under which Morton did not own the methamphetamine. Because that fact was not disputed, Morton contended that the instruction was unnecessary and inapplicable. In considering this claim on direct appeal, the Court of Appeal laid out the following factual background:

> At trial Morton testified that when he pulled the gun on Fletcher and others in the car, he intended only to get his methamphetamine back. He then asked Cauble to get the drugs back.
> The People requested the court instruct the jury using CALCRIM No. 1863 and there was no objection. The trial court instructed the jury as follows: "If a defendant obtained or attempted to obtain property under a claim of right, he did not have the intent required for the crime of attempted robbery. [¶] The defendant obtained or attempted to obtain property under a claim of right if he believed in good faith that he had a right to the specific property or a specific amount of money, and he openly took it or attempted to

take it.  [¶]  In deciding whether the defendant believed he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained or attempted to obtain the property, along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable.  But if the defendant was aware of facts that made the belief completely unreasonable, you may conclude that the belief was not held in good faith.  The claim of right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal.  [¶]  If you have a reasonable doubt as to whether the defendant had the intent required for attempted robbery, you must find him not guilty of attempted robbery."

   In closing argument, both sides argued the claim-of-right defense did not apply.  The People argued the attempted taking of either the car or the drugs supported attempted robbery (the court gave a unanimity instruction), and Morton admitted attempted robbery by claiming he pulled the gun to get his drugs back.  The People stressed, "the claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal, or known by the defendant to be illegal."  Morton argued there was no attempted robbery because he never attempted to take property of another.  He argued claim-of-right and its illegal activities exception applied only to the belief the property was defendant's, but not when the property (here the drugs) was indisputably defendant's.

*Medina*, 2015 WL 581385, at *12-13.

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination whether a jury instruction was warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380

(1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id.*

The California Supreme Court has explained the claim-of-right defense as follows:

> "'Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery.  It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent.  [Citations.]  A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent.  Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it.  [Citation.]' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1143 (*Barnett*).)

*Medina*, 2015 WL 581385, at *13.

The Court of Appeal rejected Morton's contention that the instruction should not have been given because the drugs were undisputably his based on California law that the defense "applies equally where defendant's claim to the property is in good faith, regardless of whether it is valid, mistaken, disputed or undisputed." *Id*. at *14. That interpretation of state law is binding on this Court. *Hicks v. Feiock*, 485 U.S. 624, 629-30 n.3 (1988) (state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal court sitting in habeas corpus). Because Morton claimed that his intent was simply to get his drugs back, it became necessary for the trial court to instruct on claim of right and give the jury an opportunity to decide if it applied in this case.

Moreover, even assuming that the instruction was given in error, Morton fails to demonstrate that the error was anything more than harmless.[3] Morton does not articulate how instructing as to a claim of right defense, a defense intended to benefit a person accused of a theft crime, prejudiced him in any way. He does not show that the instruction misstated the law. Furthermore, the jury was also instructed that:

> Some of these instructions may not apply, depending upon your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

Docket No. 24-26 at 69 (Reporter's Transcript at 1323).

Morton is thus not entitled to relief on this instructional error claim in any event.

D.      Evidentiary Errors (Grounds 5, 6)

---

[3]      Because the Court of Appeals did not conduct a harmless error analysis of Morton's instructional error claim, this Court conducts such review *de novo*. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (issues not addressed by the state court are reviewed in *de novo* fashion).

Morton next avers that the trial court made two evidentiary errors. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67). Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). The

"[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

1. *Evidence of previous injuries*

Morton first challenges the trial court's ruling precluding him from presenting evidence that Fletcher may have received his injuries from engaging in a prior fight. The Court of Appeal considered and rejected this claim on direct appeal as follows:

> On cross-examination Morton asked the medical examiner about abrasions and bruises on Fletcher's body. She testified he had abrasions that he could have received when he fell or "potentially" when he hit someone or was hit. There were also bruises that could have occurred at or near the time of death. Fletcher also had "a bunch of bruises" that were healing; most of these were on his legs. He had two parallel bruises, each five centimeters long, spaced 3.5 centimeters apart. She was not sure what caused these. She testified they were probably not caused by a shoe "unless it's two separate kicks with an edge . . . and they just happened to hit parallel."
>
> As relevant here, Morton then asked three questions: 1) "And really at this point in time, you can't rule out that Mr. Fletcher did not get into a fight prior to his death or at the time of his death?"; 2) "Well, with respect to your medical opinion and Mr. Fletcher perhaps getting into a fight, can you, to a medical certainty, say that he did not get in a fight at the time?"; and 3) "Could you say that his injuries are consistent with Mr. Jason Fletcher fighting at the time of his death?" The trial court sustained the People's objections on the basis of speculation as to each question.
>
> Defendants contend the trial court erred in excluding the medical examiner's opinion that Fletcher's injuries were consistent with a fight. We first observe that medical examiners are generally permitted to opine on the significance, including the potential source, of injuries to a victim. (*See Mayfield, supra*, 14 Cal.4th at p. 766 ["A forensic pathologist who has performed an autopsy is generally permitted to offer an expert opinion not only as to the cause and time of death but also as to circumstances under which the fatal injury could or could not have been inflicted"].) Because they are expert witnesses, they are permitted to "speculate" as to causation, so long as such speculating is properly within the context of giving an informed expert opinion in

response to a question. Here, however, the error in disallowing the questions was harmless, because the medical examiner had already given her opinion as to whether Fletcher's injuries could have been caused by a fight. She testified the abrasions were "potentially" caused by hitting or being hit, and it was possible, though unlikely, the parallel bruises were caused by kicks. A trial court has broad discretion under Evidence Code section 352 to exclude cumulative evidence. (*People v. Pride* (1992) 3 Cal.4th 195, 235; *see People v. Partida* (2005) 37 Cal.4th 428, 436, fn. 2.) We see no prejudicial error.

*Medina*, 2015 WL 581385, at *11-12.

The Ninth Circuit has held, however, that "[w]here a trial court commits an evidentiary error, the error is not necessarily rendered harmless where there was other, cumulative evidence properly admitted." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Krulewitch v. United States*, 336 U.S. 440, 444-45 (1949) (holding that, in a close case, erroneously admitted evidence—even if cumulative of other evidence—can "tip[] the scales against [a] petitioner"); *Hawkins v. United States*, 358 U.S. 74, 80 (1958) (concluding that erroneously admitted evidence, "though in part cumulative," may have "tip[ped] the scales against petitioner on the close and vital issue of his [state of mind]")). Here, however, the trial court's error did not have a substantial or injurious effect or influence in determining the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 116 (2007). The record supports the Court of Appeal's conclusion that Morton was nonetheless able to argue the self-defense claim. He fails to demonstrate that the result would have been any different had the medical examiner been permitted to respond to defense counsel's question, particularly given that, as the Court of Appeal noted, the medical examiner had already given her opinion as to whether Fletcher's injuries could have been caused by a fight. Morton's claim therefore fails.

2.      *Evidence of knife request*

Morton additionally contends that he was constitutionally entitled to present evidence that Fletcher sought a knife from Cauble, and that Cauble may have tried to obtain a knife before meeting with defendants. The Court of Appeal also rejected this evidentiary claim on direct appeal as follows:

> The People moved in limine to exclude evidence that Fletcher asked Cauble to find a knife before the meeting with Morton, arguing it was hearsay, irrelevant, and inflammatory. The trial court excluded the evidence, finding it was hearsay and irrelevant because defendants did not know Fletcher had sought a weapon. Later in the trial, Morton argued he should be able to ask Cauble if she had looked for a knife to impeach her claim of peacefulness and to show Fletcher's mindset. The trial court again ruled the evidence was irrelevant, and any relevance was "far outweighed" by prejudice.
>
> Defendants contend the trial court erred in excluding this evidence. First, they assert the evidence was not hearsay because it was a request and did not assert any fact. They are correct. In *People v. Jurado* (2006) 38 Cal.4th 72, our Supreme Court held a request for a "gat" (a gun) was not hearsay. "Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*Id.* at p. 117.) The statement was offered to prove the words were said, not that those words were true. The trial court erred in finding the evidence hearsay.[FN5]
>
> > FN5. The People offer the following analysis in their briefing: "First of all, it is undisputed that Fletcher is dead, so his statements constitute hearsay and are inadmissible at trial." This analysis is severely flawed, and suggests a lack of basic understanding of what does and what does not constitute hearsay.
>
> Next, defendants contend the evidence was relevant to show Fletcher's aggressive state of mind. They argue a claim of self-defense places the victim's state of mind at issue. (*People v. Romero* (2007) 149 Cal.App.4th 29, 37 [evidence of victim's fear of defendant admissible to show victim was not aggressor].) However, this evidence is not as probative as they assert—a fact which weakens their argument. It is undisputed that Fletcher did not have a knife or any weapon. Either he was comfortable meeting with Morton without a weapon, which would indicate he was not that aggressive, or he compensated for his lack of a weapon by bringing Rainville, who had a knife, with him. The jury heard evidence of Rainville's knife and that he came as "muscle." Given the limited probative value of this evidence, any error in excluding it was harmless. (*People v. Eubanks* (2011) 53 Cal.4th 110, 151.)
>
> Defendants further argue the evidence was relevant to impeach Cauble's testimony that she was a "peacemaker," who intended just to make "everything right." Cauble's state of mind—as a peacemaker or a combatant—was irrelevant; she did not have a weapon and there was no evidence she engaged in any violent act. A trial court

has discretion to exclude impeachment evidence on a collateral matter. (*People v. Price* (1991) 1 Cal.4th 324, 412.)

*Medina*, 2015 WL 581385, at *11.

Morton fares no better on federal habeas review. It is well-settled that a criminal defendant has a constitutional right to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is not, however, without limitation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing

the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's refusal to allow Morton to present testimony regarding the knife was an abuse of discretion or unreasonable or contrary to federal law. Morton argues that he should have been able to introduce extrinsic evidence attacking Cauble's credibility as a "peacemaker." He likewise contends that he should have been able to introduce the evidence to show Fletcher's "aggressive" state of mind. It was undisputed, however, that neither Fletcher nor Cauble had a knife or any other weapon, and there was no evidence that Cauble engaged in any violent act.

The trial court thus properly determined that such evidence was not sufficiently relevant in this case. The proffered evidence, although relevant, had limited probative value. The trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury. *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence"). The trial court had legitimate concerns that

proving up Fletcher's alleged request to Cauble to find a knife would have resulted in a "minitrial" that would have unduly complicated the matter.

In short, excluding the proffered evidence here did not violate the Confrontation Clause or Morton's right to present a defense, nor was it contrary to any clearly established Supreme Court authority. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *cf. Guasch v. Cates*, No. C 10-5628, 2011 WL 2471029, at *11 (N.D. Cal. June 22, 2011) ("To have allowed a trial within a trial, that is, a trial of a witness's unrelated and as-yet unproven credit-card wrong within petitioner's own trial for trying to kill his wife would have been unwise. Defense efforts like this are routinely and rightly rejected without doing any damage to the Sixth Amendment."). Accordingly, Morton is not entitled to relief on this claim.

E.    Cumulative Error (Ground 8)

Finally, Morton claims that the cumulative effect of the errors warrant reversal of his conviction. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence

introduced at trial against the defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 401 U.S. at 294.

Here, the Court of Appeal rejected Morton's cumulative error claim on direct appeal, concluding that "any errors or assumed errors were harmless, whether reviewed separately or cumulatively."  *Medina*, 2015 WL 581385, at *17.  This Court agrees that Morton does not demonstrate federal constitutional errors that would establish prejudice in the aggregate.  *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").  Morton is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Morton is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

29

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 6, 2019.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
